Reuben O. BEITELSPACHER and Ruth Beitelspacher, a/k/a Ruth Nelson Beitelspacher, Plaintiffs and Appellants,

v.

Elden L. WINTHER and Antoinette M. Winther, Defendants and Appellees.

Nos. 16388, 16389.

Supreme Court of South Dakota.

Argued May 23, 1989.

Decided Oct. 18, 1989.

Carlyle E. Richards, P.C., Aberdeen, for plaintiffs and appellants.

Mark A. Moreno of Schmidt, Schroyer, Colwill and Barnett, P.C., Pierre, for defendant and appellee, Antoinette M. Winther.

Thomas M. Tobin of Tonner, Tobin and King, Aberdeen, for defendant and appellee, Elden L. Winther.

HENDERSON, Justice.

## CASE SUMMARY

We affirm the trial court's decision on a contract for deed foreclosure, with the exception of a double counting of improvements made by the Buyers which wrongly skews the balancing of equities. Thus, we affirm in part and reverse and remand in part.

## PROCEDURAL HISTORY/ISSUES

Plaintiffs/appellants Reuben O. Beitelspacher and Ruth Beitelspacher (Sellers) initiated an action to foreclose on a 1977 contract for deed in the circuit court for Brown County after defendants/appellees Elden L. Winther and Antoinette Winther (Buyers) failed to make a final $123,585 balloon payment. After a non-jury trial, judgment was entered foreclosing Buyers' rights under the contract for deed, subject to Sellers' payment of $35,126.84 to Elden Winther. This sum represented an adjustment of the equities between the parties under SDCL 21-50-2 and per this Court's unanimous decision in *Dow v. Noble*, 380 N.W.2d 359 (S.D.1986).

Sellers contend, in their Notice of Appeal No. 16388, that the trial court erred in four regards:

1. The equitable adjustment formula of *Dow v. Noble* is inconsistent with SDCL Ch. 21-50;
2. *Dow v. Noble* should not be given retrospective application; .
3. If the *Dow v. Noble* formula applies, the trial court did not properly implement it (Sellers created six separate sub-issues on this point which are treated below); and,
4. A default judgment initially entered against Antoinette Winther should not have been set aside under SDCL

15-6-60(b) (this is essentially a red herring, but, having been raised, it is treated below).

Buyers assert, by Notice of Review, No. 16389, that the trial court erred in four aspects concerning adjustment of the equities between these parties:

1. A WEB easement penalty was improperly assessed as a detriment to the property;
2. Excessive attorney's fees were awarded to Sellers, as the trial court failed to determine what portion of Seller's claimed fees were reasonable;
3. Interest on the value of the payments made to Sellers should have been considered in balancing the equities; and,
4. Increases in "ASCS crop bases" should have been included in the equitable balancing process as they were a benefit to the property.

## FACTS

On September 30, 1977, Sellers and Buyers signed a contract for deed on Sellers' farm, which comprised 433 acres of pasture, 177 acres of cropland, and a 16-acre building site. The contract called for, inter alia, a total purchase price of $294,400, with $8,000 to be paid up front, and $77,376 due by October 16, 1977. These payments were made by Buyers. The remaining unpaid principal balance ($209,024) plus interest was to be paid in annual installments of $10,451.20 plus interest. A final balloon payment of $123,585.44 was due on November 1, 1987. The Buyers did not make their balloon payment, as Elden Winther, one of the Buyers, tried to secure financing, but failed.

The Buyers, who were married to each other at the time they entered the contract for deed, became embroiled in a divorce action. In 1987, Antoinette Winther sought a divorce in the Circuit Court for Brown County, and was granted a judgment and decree of divorce dated February 2, 1988. Interestingly, the Buyers' trial in the divorce action was held on October 27, 1987, only five days before the final balloon

payment on the contract for deed was due. The divorce decree directed Antoinette to deed her interest in the real property, subject to the contract for deed, to Elden, who was to assume all indebtedness related to such property.

Meanwhile, on January 5, 1988, as Buyers had missed their balloon payment, the Sellers initiated this foreclosure action. Although Antoinette had signed the contract for deed, she was directed by the divorce decree to transfer her interest, via quit claim deed, to Elden. She was not served with a certificate of readiness for trial, which "must be served" under SDCL 15–6–40(b), although the statute also provides that "[a]ny or all of the requirements of this rule may be dispensed with in any given case by the judge assigned to it." Antoinette did not appear at the trial, and a default judgment was entered against her. Six days after she was served with notice of the default judgment, Antoinette filed a motion, with supporting affidavit, for relief from judgment under SDCL 15–6–60(b).[1] Her motion was granted by the trial court.

At the trial itself, evidence regarding the fair rental value of the property was contradictory. Although the Sellers, by their notice of appeal, allege that the trial court erred in finding that a fair rental value of the property was $20 per acre, Reuben Beitelspacher testified that such value, for cropland and pasture, was in a $20–$25 range.

The trial court determined that the total benefit to the Sellers was $308,764.16 and Seller's total detriment was $273,637.32. The trial court made an equitable adjustment for the difference in these figures, $35,126.84, which Sellers were to pay to Buyers.

Mathematically, the trial court's equitable adjustment breaks down as follows:

Sellers' Detriment

| | | |
|---|---|---|
| 1. | Rent: | $ 99,162.11 |
| 2. | Easement Payment to Buyers: | $ 300.00 |
| 3. | Loss of Land Value: | $147,044.00 |

Sellers' Detriment

| | | |
|---|---|---|
| 4. | Expense of Original Sale: | $ 5,838.00 |
| 5. | Miscellaneous Expenses in Land Recovery: | $ 21,293.21 |
| | TOTAL DETRIMENT: | $273,637.32 |

Sellers' Benefits

1.
Principal Paid:
$179,336.80

2.
Interest Paid:
$114,179.36

3.
Improvements Made by Buyers:
$ 15,248.00

TOTAL BENEFIT: $308,764.16

Thus, the trial court's finding under the equity adjustment formula of *Dow v. Noble* was reached by subtracting $273,637.32 from $308,764.16, yielding $35,126.84.

## DECISION

A. *Seller's Notice of Appeal* (No. 16388)

I. Applying Dow v. Noble and SDCL Ch. 21–50 to the facts.

Sellers first argue that rules of statutory construction render *Dow v. Noble*, 380 N.W.2d 359 (S.D.1986) inconsistent with provisions of SDCL Ch. 21–50. Two particular statutes, SDCL 21–50–2, 21–50–3 are relied upon in Sellers' argument. SDCL 21–50–2 provides, in pertinent part: "The court in such actions shall have the power to equitably adjust the rights of all the parties thereto ..." while SDCL 21–50–3 provides:

> Upon the trial of an action under this chapter the court shall have power to and by its judgment shall fix the time within which the party of parties in default must comply with the terms of such contract on his or their part, which time shall be not less than ten days from the rendition of such judgment, and unless the parties against whom such judgment is rendered shall fully comply therewith within the time specified, such judgment shall be and become final without further

---

[1]. SDCL 15–6–60(b)(1) allows relief from final judgment on grounds of mistake, inadvertence,

surprise or excusable neglect.

order of the court, and all rights asserted under the contract shall thereupon be forever barred and foreclosed.

Sellers argue that SDCL 21–50–2 is a general statute, whereas SDCL 21–50–3 is a specific statute which limits the court's authority under SDCL 21–50–2 to fixing the time in which a defaulting party may comply with the terms of the contract. We disagree. SDCL 21–50–2 refers to "rights" which may be adjusted. SDCL 21–50–3 has a narrower reach because it deals with, particularly, only one aspect of the parties' rights—the time to cure default. The law must be so construed as to give effect to all of its provisions, if possible. *State v. Heisinger*, 252 N.W.2d 899 (S.D.1977); State *ex rel. Kriebs v. Halladay*, 52 S.D. 497, 501, 219 N.W. 125, 127 (S.D.1928). Sellers' interpretation would reduce SDCL 21–50–2 to a nullity.

Sellers' constricted interpretation of SDCL 21–50–2 is unsound, as reflected in *Severson v. Eide*, 52 S.D. 20, 25, 216 N.W. 581, 583 (1927), where this Court, interpreting R.C.1919, § 2915,[2] the predecessor of SDCL 21–50–2, wrote:

> If the situation were reversed and the rents amounted to more than the interest and taxes, we think there can be no doubt that defendants could be relieved from an apparent default by an application of the rents in payment of such interest and taxes, or as the situation is if defendants desired to hold their contract that they could reduce the amount to be paid in redemption by compelling plaintiff to account for and apply such rents to a reduction of the amount due. We can see no reason why plaintiff may not have the same right of set-off in his favor.

It is apparent that, even in 1927, the trial court's authority to adjust equities under § 2915 extended beyond the narrow confines projected by Sellers. R.C.1919 § 2914, the predecessor of SDCL 21–50–3, was not perceived by the *Severson* court as the outer limit of equitable adjustment.

This Court, in *Dow, Heikkila v. Carver*, 378 N.W.2d 214 (S.D.1985), and *Prentice v. Classen*, 355 N.W.2d 352 (S.D.1984), recognized that foreclosure of land contracts can involve unjust enrichment through forfeiture. Earlier cases rejected such arguments by generally holding that there was no forfeiture because the Seller, in such a case, was merely enforcing the contract as agreed. *Severson*, 52 S.D., at 24, 216 N.W., at 583; *Hickman v. Long*, 34 S.D. 639, 150 N.W. 298 (1914). This rule was criticized as inequitable by Professor Corbin in 1931, *see*, Corbin, *The Right of a Defaulting Buyer to the Restitution of Installments Paid*, 40 Yale L.J. 1013 (1931), cited in *Dobbs, Remedies* § 1214, p. 864 (1972). Corbin's position, as set out in *Dobbs*, was adopted by the Connecticut Supreme Court in *Vines v. Orchard Hills, Inc.*, 181 Conn. 501, 510–12, 435 A.2d 1022, 1028 (1980), (quoted approvingly in *Heikkila*, 378 N.W.2d, at 219). Numerous other courts have followed the same path:

> [T]raditional analysis would suggest that forfeiture would follow. But along this dimension, too, the courts have been actively reforming the law. Increasingly they are holding that forfeiture may not be "free" and that the Seller must return the payments he has received insofar as they exceed his actual damages.

G. Nelson and D. Whitman, *Real Estate Finance Law*, § 3.29, p. 100 (2nd Ed.1985). The last sentence appears to be the rule in a nutshell. Cases cited in support of the above statement include *Moran v. Holman*, 501 P.2d 769 (Alaska 1972); *Randall v. Riel*, 123 N.H. 757, 465 A.2d 505 (1983); *Morris v. Sykes*, 624 P.2d 681 (Ut.1981); and *Howard v. Bar Bell Land and Cattle Co.*, 81 Idaho 189, 340 P.2d 103 (1959). *See also, Freedman v. Rector, Wardens and Vestrymen of St. Mathias Parish*, 37 Cal.2d 16, 230 P.2d 629 (1951) (Denial of restitution violate public policies against forfeitures, penalties, and unjust enrichment). In *Moran*, the Alaska Supreme Court observed that "equity abhors a forfeiture", a principle observed in South Dakota at least since 1899: "Forfeitures have

2. R.C.1919, § 2915 provided, in pertinent part: "The court in such actions shall have the power

to equitably adjust the rights of all the parties thereto."

always been considered as odious in the law, and courts of law, circumscribed as their jurisdiction is, struggle against them." *Barnes v. Clement*, 12 S.D. 270, 277, 81 N.W. 301 (1899). Because the legislature consciously invoked equity in the form of SDCL 21–50–2, we reject Sellers' position. We reaffirm *Dow v. Noble*.[3]

### II. Retrospective Application of Dow v. Noble.

■ Sellers next argue that *Dow v. Noble*, 380 N.W.2d 359 (S.D.1986), should not be applied here because they relied, under their contract for deed, upon earlier South Dakota caselaw. However, the keystone emphasis in Sellers' argument is S.D. Constitution Article VI, Sec. 12, which provides that "[n]o ex post facto law, or law impairing the obligation of contracts or making any irrevocable grant or privilege, franchise or immunity, shall be passed." Thus, their argument is double-barrelled.

Authorities from this jurisdiction and elsewhere, establish that there is no "black letter" prohibition on applying *Dow* retroactively:[4]

> The provision of the Federal Constitution is that no state "shall pass any . . . law" impairing the obligation of contracts. (note omitted). *This prohibition*, according to the rule of the federal courts and most state courts, *is directed only against impairment by legislation, and not by judgments of courts.* There is no vested right in the decisions of a court, and a change of decisions of a state court does not constitute the passing of a law, although the effect of such change is to impair the validity of a contract made in reliance on prior decisions. (note omitted, emphasis supplied)

16A Am.Jur.2d, *Constitutional Law* § 703, at 712–13 (1979). Here, SDCL 21–50–2 and predecessors have been on the books since 1913. Therefore, the point at issue here is not really SDCL 21–50–2, but was Sellers' retention of payments a forfeiture? This is a matter of equity, the principles of which are ancient.

■ While this Court has, in the past, declined to give retrospective application to a new rule, as in *Rollinger v. J.C. Penney Co.*, 86 S.D. 154, 192 N.W.2d 699 (1971), *Baatz v. Arrow Bar*, 426 N.W.2d 298 (S.D. 1988), presents a situation where this Court did apply a new ruling (*Walz v. City of Hudson*, 327 N.W.2d 120 (S.D.1982)) retrospectively. Three criteria are used to determine whether a rule is to be given retrospective application:

1. The purpose to be served by the particular new rule;

2. The extent of reliance which has been placed upon the old rule; and,

3. The effect on the administration of justice of a retroactive application of the new rule.

*Baatz*, at 301. The purpose of allowing buyers to claim restitution is to prevent unjust enrichment on the part of sellers. *Heikkila v. Carver*, 378 N.W.2d 214, 219 (S.D.1985). As in *Baatz*, retroactive application is necessary to effectuate the intent and purposes of the rule. As to the degree of reliance Sellers may have placed upon earlier case law, *Severson* indicated that the language of R.C.1919, § 2915 (now codified in SDCL 21–50–2) could be given a broad reading, as shown in our treatment of Issue I, *supra*. Further, this Court, in *Rollinger*, 86 S.D., at 164 n. 6, 192 N.W.2d, at 704 n. 6, indicated that the defendant was engaged in a practice (revolving charge accounts) that had never been declared usurious by a court in any state.

---

**3.** Balancing the equities between the parties is, indeed, a difficult job for a circuit court judge. However, although the minority writer characterizes this area of the law as "a can of worms," this law had been on our statute books since 1913. Throughout our state's history, circuit court judges have labored under many factual scenarios to balance the equities during times of the Great Depression, drouth, wars, prosperity and periods of high bankruptcy filings. The minority's phraseology that destruction of real estate contracts looms in South Dakota due, apparently, to a reliance on *Dow* and SDCL 21–50–2 is conjectural hyperbole.

**4.** *Dow* is retroactive, here, in the sense that *Dow* (1986), and its predecessors, *Heikkila v. Carver*, 378 N.W.2d 214 (S.D.1985) and *Prentice v. Classen*, 355 N.W.2d 352 (S.D.1984) were all handed down well after this contract was signed in 1977.

Here, the rule urged by Sellers had been under attack since 1931. See Corbin, *The Right of a Defaulting Buyer to the Restitution of Installments Paid,* 40 Yale L.J. 1013 (1931). As shown in Issue I, numerous courts have ruled against sellers in this situation, including *Howard v. Bar Bell Land and Cattle Co.,* 81 Idaho 189, 340 P.2d 103 (1959), which was handed down long before creation of this contract. Regarding an effect on the administration of justice from a standpoint of efficiency or volume, we visualize no great wave of heightened litigation.

■ We have weighed the inequity imposed by retroactive application, as mentioned in *Fisher v. Sears, Roebuck and Co.,* 88 S.D. 1, 5, 214 N.W.2d 85, 87 (1974). In this case we find that greater inequity would result by giving *Dow* only prospective effect. The Constitution neither prohibits nor requires retrospective effect of judicial decisions. *Vogt v. Billion,* 405 N.W.2d 635 (S.D.1987). Retrospective application of *Dow* does not, in our view, present a risk of inequitable results because balancing of the equities between Sellers and Buyers is inherent in *Dow* and SDCL 21–50–2. The only loss to sellers is the possibility of reaping a windfall.

### III. Balancing the Equities

Sellers' third argument entails six individual allegations of error:

1. The trial court's determination that $20 per acre fair rental value for cropland was incorrect;

2. Improvements made by Buyers were counted twice;

3. All costs of original sale were not allowed as detriment to Sellers;

4. Sellers' increased income tax liability from repossession should have been considered;

5. Income tax paid by Sellers on interest payments received from Buyers should have been considered; and,

6. Income tax savings of the Buyers should have been considered.

■ We reject Sellers' first assertion that the trial court's assessment of rental value was not based on the evidence. Seller Reuben Beitelsbacher testified at trial that cash rental of cropland *or* pasturage was in the $20 to $25 range. It is beyond cavil that a party can claim no better version of the facts to which he himself has testified.

■ Sellers' second allegation, that improvements were counted twice, is substantiated by the evidence. The improvements consisted of a well dug in 1983, reroofing a barn, carpeting, corral repair, and grain bins, totalling $15,248. These were apparently considered in the appraisals made of the property, and thus were counted already, before the trial court added them as benefits to Sellers. Appraiser Gerhanter made specific reference to the modernity and good repair of the house, the "good utility of the other buildings", the storage bins, and the new well (the old one had dried up). Daniel Chase's appraisal makes reference to the house carpeting, grain bins, and well. The trial court, in adding the value of the improvements to the benefits Sellers received, counted these assets twice.

■ We reject Sellers' claim that the trial court erred in apportioning the costs of the 1977 sale among the parties. Sellers, by the trial court's calculations, received 61 percent of the contract purchase price. In adjusting the equities under SDCL 21–50–2, we find no error in allowing Sellers only 39 percent of the sale expense as a credit.

■ The fourth, fifth and sixth allegations are difficult to analyze, as Sellers cite no authority beyond *Dow v. Noble,* 380 N.W.2d 359 (S.D.1986), which makes no mention of income taxes. As in *Dow,* at 361, where this Court denied a buyer interest on a down payment, we, therefore, hold that the trial court was not clearly erroneous in disregarding these three claims. A relatively detailed analysis of caselaw involving foreclosure restitution, *see* G. Nelson and D. Whitman, *Real Estate Finance Law,* § 3.29, p. 100–108 (2nd. Ed.1985), also does not refer to these tax aspects. Sellers' tax arguments would take the Court far afield. Federal income tax liabilities

are not what these parties were contracting for. Their contract dealt with land and payments.

Summarizing Sellers' six claims made under this issue, we find error on only the second, double counting of improvements. The remaining five claims are without merit.

### IV. Default Judgment

 There was no abuse of discretion in the trial court's decision to set aside the default judgment against Buyer Antoinette Winther. A motion to vacate a judgment under SDCL 15–6–60(b) is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *Haggar v. Olfert*, 387 N.W.2d 45 (S.D.1986); *Strouse v. Olson*, 397 N.W.2d 651 (S.D.1986). In this regard we note that no certificate of readiness for trial was served on Antoinette, in violation of SDCL 15–6–40(b). Although 15–6–40(b) provides that such requirements may be dispensed with by the trial judge, he need not do so. The statute is permissive in phraseology. In the circumstances of this case, we do not deem the trial court's decision on this issue to be an abuse of discretion. Further, this default judgment, as a practical matter, seems only to affect the trial court's distribution of attorney's fees, part of which were, initially, to be paid by Antoinette. Sellers attorney's fees are, by the trial court's later judgment, to be deducted from the Buyers' restitution, so this issue is an irrelevance.

### B. *Buyers' Notice of Review (No. 16389)*

 Buyers challenge the trial court's adjustment of equities on four grounds: 1) A WEB water easement penalty should not be counted as a detriment to the Sellers; 2) the trial court failed to determine what portion of the Sellers' attorney's fees were reasonable; 3) interest on the value of Buyers' payments should be considered as a benefit to Sellers; and 4) increases in "ASCS crop bases" should be considered as benefits to Sellers. We disagree.

The WEB penalty issue arose through Buyers' decision to deny WEB, a rural water supplier, an easement across the property, necessitating changes in WEB's construction. To hook up to the WEB water distribution system, owners of the property, as a result of Buyers' decision, must pay a penalty of $11,958. The evidence at trial indicates that one well had gone dry on the property, and the artesian water from the well dug by Buyers stained clothing. Further, the appraisals of Chase and Gerhanter included access to WEB water as part of their determination of the property's value, a factor which is offset, to a degree, by the WEB penalty. The trial court did not err on this question.

 As to attorney's fees, these were awarded as part of the balancing of equities under SDCL 21–50–2. "We believe that the Sellers' detriment, including fees accrued in actions related to the property, also is properly part of the trial court's balancing process under SDCL 21–50–2." *Dow v. Noble*, 380 N.W.2d 359, 360 (S.D. 1986). These fees are not awarded as costs. *Dow, id.* The trial court, thus, did not err in its award. Also, Elden Winther's proposed Finding of Fact No. 14 conceded that Sellers had incurred $7,903 in attorney's fees, as a detriment.

 We likewise reject Buyers' argument that interest should have been calculated on the principal payments received by the Sellers. This appears to be a variant of an argument this Court rejected in *Dow*, where the Buyers argued, without citing authority, that interest should have been calculated on their down payment. Now, as then, no authority is cited. Lacking same, we dismiss the argument. *Corbly v. Matheson*, 335 N.W.2d 347 (S.D.1983). As in *Dow*, at 361, we hold that "the trial court was not clearly erroneous in not considering this item."

 Finally, we deem Elden Winther's assertion that increased participation in ASCS crop programs should have been considered, to be waived. Again, no authority is cited which indicates error by the trial court. See *Dow*, at 361.

Affirm in part, reverse and remand in part.

WUEST, C.J., and MORGAN, J., concur.

SABERS and MILLER, JJ., dissent.

SABERS, Justice (dissenting).

I dissent.

If courts are going to take on the responsibility under SDCL 21–50–2 and attempt to adjust the equities of the parties, they must be prepared to do the whole job, not just a part. The failure to balance all the equities of the parties is contrary to the letter and spirit of SDCL 21–50–2, *Heikkila v. Carver*, 378 N.W.2d 214 (S.D.1985), and *Prentice v. Classen*, 355 N.W.2d 352 (S.D. 1984).

First, the court erred in not considering all the costs of the original sale. It is patently unfair to allow "Sellers only 39 percent of the sale expense as a credit[;]" Sellers incurred 100 percent. Since Sellers will necessarily incur additional expenses when the property is resold, all of the original expenses must be considered a detriment.

Second, the majority rejects, without any substantial analysis, Sellers' claims of error concerning failure to consider

—Sellers' increased income tax liability from repossession;

—Income tax paid by Sellers on interest payments received from Buyers; and

—Income tax savings by Buyers.

The reasons given by the majority in rejecting Sellers' claims are wholly inadequate. Apparently, they are 1) *Dow v. Noble*, 380 N.W.2d 359 (S.D.1986), makes no mention of income taxes, 2) *Dow* denied a buyer interest on a down payment, 3) tax aspects are not referred to in a certain authority on foreclosure restitution, 4) tax considerations "would take the Court far afield" and 5) tax liabilities were "not what these parties were contracting for [as t]heir contract dealt with land and payments." In effect, the majority is saying: We have never considered these claims before, so we cannot consider them now.

The irony of these statements is obvious. The court is bold enough to change this contract for deed to a mere lease arrangement, but shies away from tax considerations because that is "not what these parties were contracting for." These parties were not contracting for a lease arrangement either, but that did not stop the majority. If the majority is going to attempt to equitably adjust the rights of the parties by focusing on the detriments and benefits to the Sellers, then the tax issues must be taken into consideration since the tax consequences of the transaction significantly impact Sellers' detriments and benefits. For example, if the Sellers' taxes will increase as a result of the repossession, that is as much a detriment to Sellers as any "Miscellaneous Expenses in Land Recovery." By the same token, the tax on the interest payments cannot be ignored. If the measuring criteria is the amount of benefit to Sellers, then it is illogical to use the amount of Buyers' expense in the analysis. While Buyers may have paid $114,179.36 in interest, Sellers did not benefit by that amount. Sellers' true benefit is the amount of interest retained after taxes, and that is the amount that should be used.

### A Simpler Approach to Equitable Adjustment

The difficulty and complexity of including tax calculations in the court's analysis of benefits and detriments is readily apparent. In fact, it is probably impossible to equitably adjust all the rights of the parties by focusing upon the benefits and detriments to Sellers. Therefore, this court would be better served by an approach that attempts to enforce the agreement entered into by the parties, rather than an approach that attempts to convert a contract for deed into a lease agreement. As explained in Freyfogle, *Vagueness and the Rule of Law: Reconsidering Installment Land Contract Forfeitures*, 1988 Duke L.J. 609 (1988):

[A] vendor should have the right to obtain the benefit of her contract bargain.... Full compensation is the normal rule in contract breach settings; there is no particular reason to deviate from the rule here. In determining the amount of the vendor's recovery, courts should focus on the proper method of

damage calculation. The purchaser's payments, as well as the purchaser's equity, are irrelevant. What is relevant is simply the value of the property (at the date on which the vendor recovers it) and the unpaid contract amount.

*Id.* at 650. It cannot be said this approach is inequitable as there is nothing inequitable about giving the Sellers the benefit of their bargain.

Equitable adjustment of the rights of the parties is still easily achieved under the above described approach. As explained by Professor Freyfogle:

> Courts can calculate the restitution amount simply: the purchaser is entitled to the excess of the property's value over the unpaid purchase price. A state, as a policy matter, might allow the vendor to retain some portion of the excess as extra compensation for her injuries.

*Id.* To equitably adjust the rights of the parties, the court simply subtracts the payment due Sellers from the property value and Buyers are entitled to a refund of the excess. However, Sellers should be allowed to offset their foreclosure expenses against the refund so they are not penalized for enforcing the contract. Here, Sellers were entitled under the contract to a balloon payment of $123,585.44 plus interest from the due date, November 1, 1987. In lieu of such a payment, the property, with a value adjudged to be $147,356.00, will be returned to Sellers. In this situation the equitable adjustment works out as follows:

| | |
|---|---|
| property value: | $147,356.00 |
| LESS | |
| balloon payment: | $123,585.44 |
| interest at 7.5% from 11–1– 87 to 10–1–89: | $ 18,374.85 |
| Refund: | $ 5,395.71 |
| LESS | |
| foreclosure expense offset: | $ 21,293.21 |
| Amount due Buyers: | ($ 15,897.50) |

Under this approach, Sellers do not receive a windfall. Instead, they incur a loss of almost $16,000 in unrecovered foreclosure expenses. In other words, Sellers still fall short of receiving the full benefit of their bargain. At the same time, the court's interference with the contract is minimal.

I have great empathy for this elderly, retired farm couple who sold their farm and moved to town in 1977 in hopes of a financially secure and peaceful retirement, but must now pay $19,878.84, plus interest, to regain possession of their farm. This area of the law, as interpreted and implemented by the majority, is a can of worms. It may well be the death of contract for deed sales of farms, homes, and businesses. For example, see the problems identified in *Freyfogle, supra,* and in my writing in *Safari, Inc. v. Verdoorn,* 446 N.W.2d 44, 47 (S.D.1989).

I am authorized to state that MILLER, J., joins in this special writing.